**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

BRONX HARBOR HEALTH CARE COMPLEX, INC. D/B/A KINGS HARBOR MULTICARE CENTER; ABRAHAM OPERATIONS ASSOCIATES LLC D/B/A BETH ABRAHAM CENTER FOR REHABILITATION AND NURSING; ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ALLEGANY, LLC; ABSOLUT CENTER FOR NURSING AND REHABILITATION AT AURORA PARK, LLC; AURNC OPERATING, LLC D/B/A AUBURN REHABILITATION & NURSING CENTER; AVON NURSING HOME, LLC; BAINBRIDGE NURSING AND REHABILITATION CENTER, LLC; BEACH TERRACE CARE CENTER, INC. D/B/A BEACH TERRACE CARE CENTER; BETSY ROSS REHABILITATION CENTER, INC. D/B/A BETSY ROSS NURSING & REHAB CENTER; BORO PARK OPERATING CO, LLC D/B/A BORO PARK CENTER FOR REHABILITATION & HEALTHCARE; BVRNC OPERATING, LLC D/B/A SODUS REHABILITATION & NURSING CENTER; CLR CARTHAGE, LLC D/B/A CARTHAGE CENTER FOR REHABILITATION AND NURSING; CLR GLENS FALLS, LLC D/B/A GLENS FALLS CENTER FOR REHABILITATION AND NURSING; CLR MINOA, LLC D/B/A ONONDAGA CENTER FOR REHABILITATION AND NURSING; CLR NEW PALTZ, LLC D/B/A NEW PALTZ CENTER FOR REHABILITATION AND NURSING; CLR TROY, LLC D/B/A TROY CENTER FOR REHABILITATION AND NURSING; COMPREHENSIVE AT ORLEANS, LLC D/B/A THE VILLAGES OF ORLEANS HEALTH AND REHABILITATION CENTER; COMPREHENSIVE AT WILLIAMSVILLE, LLC D/B/A COMPREHENSIVE REHABILITATION AND NURSING CENTER AT WILLIAMSVILLE; CONESUS LAKE NURSING HOME, LLC; DELAWARE OPERATIONS ASSOCIATES LLC D/B/A BUFFALO CENTER FOR REHABILITATION AND NURSING; DOJ OPERATIONS ASSOCIATES LLC D/B/A TRIBORO CENTER FOR REHABILITATION AND NURSING; DRY HARBOR HRF, INC. D/B/A DRY HARBOR NURSING HOME; DURNC OPERATING, LLC D/B/A DUNKIRK REHABILITATION & NURSING CENTER; EAST HAVEN NURSING AND REHABILITATION CENTER, LLC; EDRNC OPERATING, LLC D/B/A EDEN REHABILITATION & NURSING CENTER; ESSEX OPERATIONS ASSOCIATES LLC D/B/A ESSEX CENTER FOR REHABILITATION AND HEALTHCARE; FULTON OPERATIONS ASSOCIATES, LLC D/B/A FULTON CENTER FOR REHABILITATION AND HEALTHCARE; GARDEN GATE HEALTH CARE FACILITY, LLC; GRANDELL REHABILITATION AND NURSING CENTER, INC. D/B/A GRANDELL REHABILITATION AND NURSING CENTER; GRNC OPERATING LLC D/B/A GHENT REHABILITATION & NURSING CENTER; HAMILTON MANOR NURSING HOME, LLC; HAVEN MANOR HEALTH CARE CENTER, LLC; HIGHLAND CARE CENTER, INC.; HOLLIS OPERATING CO., LLC D/B/A HOLLISWOOD CENTER FOR REHABILITATION AND HEALTHCARE;

**COMPLAINT**

Civil Action No.1:24-cv-1573 (GTS/CFH)

HORNC OPERATING, LLC D/B/A HOUGHTON REHABILITATION & NURSING CENTER; HRNC OPERATING, LLC D/B/A HIGHLAND REHABILITATION AND NURSING CENTER; IR OPERATIONS ASSOCIATES LLC D/B/A GRANVILLE CENTER FOR REHABILITATION AND NURSING; KAATERSKIL OPERATING LLC D/B/A GREENE MEADOWS NURSING AND REHABILITATION CENTER; LATTA ROAD NURSING HOME EAST, LLC; LATTA ROAD NURSING HOME WEST, LLC; LEROY OPERATING LLC D/B/A LEROY VILLAGE GREEN NURSING AND REHABILITATION CENTER; MEADOW PARK REHABILITATION & HEALTH CARE CENTER, LLC; MONTGOMERY OPERATING COMPANY, LLC D/B/A MONTGOMERY NURSING AND REHABILITATION CENTER; MOSHOLU PARKWAY NURSING & REHABILITATION CENTER, LLC; NEW VANDERBILT REHABILITATION AND CARE CENTER, INC.; NEWARK MANOR NURSING HOME, INC.; OCEANSIDE CARE CENTER, INC. D/B/A OCEANSIDE CARE CENTER; ONTARIO OPERATIONS ASSOCIATES LLC D/B/A ONTARIO CENTER FOR REHABILITATION AND HEALTHCARE; OPTIMA CARE LITTLE NECK, LLC D/B/A LITTLE NECK CARE CENTER; OPTIMA CARE SMITHTOWN, LLC D/B/A BROOKSIDE MULTICARE NURSING CENTER; OPTIMA CARE WHITE PLAINS, LLC D/B/A WHITE PLAINS CENTER FOR NURSING CARE; ORRNC OPERATING, LLC D/B/A ORCHARD REHABILITATION & NURSING CENTER; PALFFY GROUP LLC D/B/A ALPINE REHABILITATION AND NURSING CENTER; PARK MANOR ACQUISITION II, LLC D/B/A MIDDLETOWN PARK REHABILITATION & HEALTH CARE CENTER; PARKVIEW OPERATING CO., LLC D/B/A WESTCHESTER CENTER FOR REHABILITATION & NURSING; PAVILION OPERATIONS LLC D/B/A CORNING CENTER FOR REHABILITATION AND HEALTHCARE; PENFIELD PLACE, LLC; PHARNEY GROUP, LLC D/B/A TARRYTOWN HALL CARE CENTER; PINE HAVEN OPERATING, LLC D/B/A PINE HAVEN HOME; PRNC OPERATING LLC D/B/A PLATTSBURGH REHABILITATION AND NURSING CENTER; PUTNAM OPERATING ACQUISITION I, LLC D/B/A PUTNAM NURSING & REHABILITATION CENTER; QUEENS-NASSAU NURSING HOME, INC. D/B/A QUEENS NASSAU REHABILITATION AND NURSING CENTER; RALEX SERVICES, INC. D/B/A GLEN ISLAND CENTER FOR NURSING AND REHABILITATION; REGEIS CARE CENTER, LLC D/B/A REGEIS CARE CENTER; RIVER RIDGE OPERATING LLC D/B/A RIVER RIDGE LIVING CENTER; ROCKAWAY OPERATIONS ASSOCIATES, LLC D/B/A FAR ROCKAWAY CENTER FOR REHABILITATION AND NURSING; S&J OPERATIONAL, LLC D/B/A MILLS POND NURSING AND REHABILITATION CENTER; SALEM ACQUISITION I, LLC D/B/A SALEM HILLS REHABILITATION AND NURSING CENTER; SAPPHIRE CENTER FOR REHABILITATION AND NURSING OF CENTRAL QUEENS, LLC; SARNC OPERATING, LLC D/B/A SALAMANCA REHABILITATION & NURSING CENTER; SCHNUR

OPERATIONS ASSOCIATES LLC D/B/A MARTINE CENTER FOR REHABILITATION AND NURSING; SENECA HEALTH CARE CENTER, LLC; SENECA NURSING & REHABILITATION CENTER, LLC; SKY VIEW REHABILITATION AND HEALTH CARE CENTER, LLC; SOUTH SHORE REHABILITATION, LLC D/B/A SOUTH SHORE REHABILITATION AND NURSING CENTER; SUSQUEHANNA NURSING & REHABILITATION CENTER, LLC; SV OPERATING THREE, LLC D/B/A RICHMOND CENTER FOR REHABILITATION AND SPECIALTY HEALTHCARE; THE BRIGHTONIAN, INC.; THE HURLBUT, LLC D/B/A THE HURLBUT; THE SHORE WINDS, LLC D/B/A THE SHORE WINDS; URNC OPERATING, LLC D/B/A UTICA REHABILITATION & NURSING CENTER; WARREN OPERATIONS ASSOCIATES LLC D/B/A WARREN CENTER FOR REHABILITATION AND NURSING; WARTBURG RECEIVER LLC D/B/A BUSHWICK CENTER FOR REHABILITATION AND HEALTH CARE; WASHINGTON OPERATIONS ASSOCIATES LLC D/B/A WASHINGTON CENTER FOR REHABILITATION AND HEALTHCARE; WATERFRONT OPERATIONS ASSOCIATES LLC D/B/A ELLICOTT CENTER FOR REHABILITATION AND NURSING; WATERVIEW ACQUISITION 1, LLC D/B/A WATERVIEW HILLS REHABILITATION AND NURSING CENTER; WAYNE CENTER FOR NURSING & REHABILITATION, LLC; WEST LAWRENCE CARE CENTER, LLC; WESTGATE OPERATIONS ASSOCIATES, LLC D/B/A ROCHESTER CENTER FOR REHABILITATION AND NURSING; WILLIAMSVILLE SUBURBAN, LLC; WOODSIDE MANOR NURSING HOME, INC.; AND YRNC OPERATING, LLC D/B/A YORKTOWN REHABILITATION & NURSING CENTER,

PLAINTIFFS,

V.

JAMES V. MCDONALD, M.D., M.P.H., AS COMMISSIONER OF HEALTH OF THE STATE OF NEW YORK, OR HIS PREDECESSOR OR SUCCESSOR IN OFFICE,

DEFENDANT.

Plaintiffs, by and through their attorneys, Harter Secrest & Emery LLP, respectfully allege as follows:

3

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as Plaintiffs' claims arise under 42 U.S.C. § 1983, the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1396a(a)(13)(A), and the inherent equity powers of this Court under *Ex Parte Young*, 209 U.S. 123 (1908) and its progeny.  The declaratory relief that Plaintiffs seek is available under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b) as this Court is located in the judicial district where Defendant the Commissioner of Health of the New York State Department of Health (the "Commissioner") resides and where a substantial part of the events giving rise to Plaintiffs' claims have occurred, are now occurring, or will occur in the future.  In addition, some of the nursing homes operated by Plaintiffs are located within this district and are affected by the harms targeted by this action.

**NATURE OF THIS PROCEEDING**

3.     Plaintiffs are the operators of 92 for-profit, otherwise known as "proprietary," nursing homes located in and licensed by the State of New York, which homes participate in the federal/state Medicaid program.  Plaintiffs all operate facilities that have exceeded, or are about to exceed, their so-called "useful life" of 40 years, as determined by the State.[1]

4.     As demonstrated herein, the State's term, "useful life" is a misnomer, because - - upon information and belief - - the majority of facilities in New York have exceeded or will soon exceed this milestone, but these facilities remain vibrant, necessary providers in the senior care continuum.  They also remain duly licensed by the State and many of them are among the highest-quality providers in both the state and nation.

---

[1] Specifically, all Plaintiffs consist of facilities that have been in operation for 35 years or more.

5.    In addition, construction of new nursing homes in New York has ground to an effective halt, with approval delays spiraling out of control and only few new facilities having been constructed in recent years.

6.    Construction of a new nursing home is also vastly more expensive than refurbishing an existing home, such that an increase in new construction does not comport with the overall goal of the New York State Medicaid Plan to reduce the cost of necessary care to what is reasonable and adequate under the circumstances.

7.    The State, and the thousands of vulnerable New York residents in need of nursing home care, are therefore more and more reliant on older facilities with each passing year.  And as each year passes, a larger demographic is reliant on skilled nursing care.  This is the so-called "Silver Tsunami" in which the number of individuals age 65 and older in the United States is expected to nearly double in the next forty years.[2]

8.    Despite this increasing need for their services, and as demonstrated herein, the New York State Department of Health (the "Department") has specifically targeted older, for-profit facilities with a 100% reduction in reimbursement for their ongoing capital expenses necessary for upkeep and refurbishment of their facilities.

9.    In response, Plaintiffs bring this action seeking declaratory and injunctive relief to halt the Commissioner's unequal and irrational treatment of Plaintiffs, based solely upon years of operation, when compared to other proprietary homes.  In doing so, Plaintiffs seek maintenance of proportionate funding for their ongoing capital costs as required under the federal Social

---

[2] *See* Administration for Community Living, *2020 Profile of Older Americans*, May 2021, https://acl.gov/sites/default/files/Profile%20of%20OA/2020ProfileOlderAmericans_RevisedFinal.pdf ("The population age 65 and older increased from 39.6 million in 2009 to 54.1 million in 2019 (a 36% increase) and is projected to reach 94.7 million in 2060.  By 2040, there will be about 80.8 million older persons, more than twice as many as in 2000.")

Security Act, the federally approved New York State Medicaid Plan, and the implementing statutes and rules thereunder.

10.   Plaintiffs further seek relief concerning the Commissioner's failure to engage in the most fundamental step in setting capital reimbursement rates for nursing homes in New York: determining that the rates applied are reasonable and adequate to meet the necessary capital costs of residential long-term care.  By definition, such care requires that providers supply, and the State pay for, the "home" in which nursing home residents live and receive their care.

11.   The relevant capital costs include necessary items such as:  (i) replacement of major fixed equipment, such as a commercial freezer, an elevator, or an HVAC system; (ii) replacement and refurbishment of hard surfaces external to the facility, such as patios, parking lots, sidewalks, and walkways; (iii) upkeep and replacement of crucial facility components, such as the roof, windows, masonry, doors, and wiring; (iv) refurbishment of rooms and other public and private spaces within the facility; (v) investment in any expansion of the facility, including creation of a new wing or addition; and (vi) any other necessary cost relating to upkeep or refurbishment of the facility.

12.   These ongoing capital costs are necessary for all nursing homes, but are even more necessary for Plaintiffs, given the age of their facilities, and their thousands of vulnerable residents.  Of course, the older a building is, the more necessary costs accrue for upkeep and refurbishment of the building.

13.   Despite this undisputable truth, the New York State Department of Health, in its recent so-called "Notice Rates" provided to Plaintiffs on or about November 1, 2024, has indicated its intent to pay Plaintiffs, either beginning in 2025 or soon thereafter, absolutely nothing in reimbursement for ongoing and necessary capital costs.  Reimbursement for such costs continues

unabated, however - - and rightfully so - - for proprietary nursing homes that operate in facilities with fewer years of operation than Plaintiffs.

14.    In adopting this change, the Commissioner and the Department have violated Plaintiffs' equal protection rights under the United State Constitution, in that Defendant has unduly singled out Plaintiffs for disparate treatment, when compared to other proprietary nursing homes with fewer years of operation, and such disparate treatment lacks rational basis.  In the addition, this singling out has been driven by animus in the Department toward the operators of older, proprietary facilities in New York, which are the most vulnerable to reimbursement changes, and are often the most vociferous in opposition, when the State reduces funding for care provided to their residents.

15.    Before announcing this change in capital reimbursement, Defendant also failed to determine what level of capital reimbursement is necessary for the ongoing operation of Plaintiffs' facilities.  Had he done so, the Commissioner would have determined that in no respect can $0 of reimbursement for ongoing and necessary capital costs be considered proportionate, reasonable, and adequate for the provision of residential care to Plaintiffs' frail and vulnerable residents.

16.    This failure violates Plaintiffs' right to due process under 42 U.S.C. § 1396a(a)(13)(A) and the United States Constitution.

17.    Specifically, 42 U.S.C. § 1396a(a)(13)(A) provides Plaintiffs and all other relevant stakeholders, including other facilities and impacted residents, with a due process right to disclosure of the methodology and justification behind any such rate change, with a reasonable comment period, before it occurs.  Because the Department of Health did not undertake the necessary step under its federally approved State Plan of determining proportionality and

adequacy of reimbursement prior to issuing its recent 100% reduction in Plaintiffs' capital funding, it could not and did not meet the disclosure requirements of 42 U.S.C. § 1396a(a)(13)(A).

18.    On the basis of these constitutional claims, Plaintiffs seek to halt implementation of the recently noticed 100% reduction in ongoing capital reimbursement for Plaintiffs unless and until the Commissioner, through his Department of Health, determines a funding level or mechanism that does not violate Plaintiffs' equal protection rights and, under 42 U.S.C. § 1396a(a)(13)(A), discloses the methodology and justification for such funding, with a reasonable comment period, prior to implementation.

## THE NEW YORK MEDICAID PROGRAM FOR LONG TERM CARE AND THE STATUTORY AND REGULATORY FRAMEWORK CONCERNING CAPITAL REIMBURSEMENT

19.    The New York State Constitution obligates the State to provide medical care to those that cannot afford it.  *See* N.Y. Const. Art. XVII, § 1.  The State has undertaken to provide this care, which includes residential long-term care, through private providers, such as Plaintiffs.

20.    The State pays for such constitutionally mandated care through the federal/state Medicaid program.  The State may only participate in the Medicaid program if it obtains federal approval for a State Medicaid Plan.  The rules for nursing home reimbursement under the federally approved State Plan for New York are found in New York Public Health Law ("PHL") Article 28, primarily under N.Y. PHL § 2808, and supporting regulations, found at 10 N.Y.C.R.R. § 86-2.[3]

---

[3] The New York State Medicaid Plan as approved by the federal Centers for Medicare and Medicaid Services ("CMS") is found at https://www.hcrapools.org/medicaid_state_plan/DOH_PDF_PROD/nys_medicaid_state_plan.pdf.  The New York State Medicaid reimbursement regulations must adhere to the approved Plan for participation in the Medicaid program.  *See* 42 C.F.R. § 430.12(c)(1)(ii) ("The plan must

21.    Because these state rules make up the reimbursement methodology of the State Plan, the methodology for nursing home Medicaid reimbursement rates contained therein must also comply with the relevant provisions of Title XIX of the federal Social Security Act, found generally at 42 U.S.C. § 1396 *et seq.* and in implementing regulations contained in 42 C.F.R. § 447.  This includes the substantive rate requirements provided under 42 U.S.C. § 1396a(a)(30) and the disclosure and due process requirements under 42 U.S.C. § 1396a(a)(13)(A).

22.    Moreover, in providing care through private providers such as Plaintiffs in the long-term care space, the State must ensure that the Medicaid Plan operates efficiently with sufficient and qualified personnel in charge of rate-setting, 42 U.S.C. § 1396a(a)(4), and that it reimburses providers for all costs necessary to provide high-quality care, in "the best interests of the recipients[,]" *see id.* § 1396a(a)(19).

23.    In addition, beyond paying the bare minimum of what is necessary to provide care, the New York State Medicaid Plan, as is the case with all state plans, must establish a process to "assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available to the general population in the geographic area." *See id.* § 1396a(a)(30)(A).

24.    As Medicaid program providers, Plaintiffs are required to provide all care, including room and board, necessary "to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident." *See id.* § 1396r(b)(4)(a)(i).

25.    Under the New York State Medicaid Plan, this includes providing a facility that makes "reasonable accommodation of individual needs and preferences," allows residents to

---

provide that it will be amended whenever necessary to reflect . . . [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program.").

"participate in social, religious and community activities," "stimulate[s] and support[s] the [resident's] desire to use his or her physical and mental capabilities to the fullest extent and enable the resident to maintain a sense of usefulness and self-respect," and is "a safe, clean, comfortable and homelike environment" with adequate climate and sound control. *See* 10 N.Y.C.R.R. § 415.5(d) ("Participation in other activities"); *id.* § 415.5(e) ("Accommodation of needs"); *id.* § 415.5(f) ("Activities"); *id.* § 415.5(h) ("Environment"); *see also* N.Y. PHL § 2803-c.

26.    Of course, the place where such care is provided is in the physical facility itself:  in rooms that preserve resident privacy; in spaces with adequate and updated HVAC systems, weathertight windows, and watertight roofs; in a "homelike environment" that may not have been a design focus for a facility constructed in the 1980s or earlier.

27.    It is for this reason that the federally approved New York State Medicaid Plan, as implemented in relation to nursing homes through PHL § 2808, mandates that all facilities, regardless of age or sponsorship, *e.g.*, proprietary or not-for-profit, otherwise known as "voluntary" facilities, receive reasonable and adequate reimbursement for ongoing capital expenses.  Other than Plaintiffs, however, all other nursing homes in New York will continue to receive reimbursement for these necessary costs.

28.    Indeed, in the opening sections of PHL § 2808, the New York State Legislature mandated, effective as of 1979, that the Department of Health promulgate and perpetually maintain regulations for payment of "real property costs."  *See* PHL § 2808(2-a)(a).  In practice, this has become the so-called "capital" component of the nursing home Medicaid rate in New York, which encompasses costs traditionally though of under the heading of "real estate," *i.e.*,

construction expenses, upkeep and refurbishment, as well as other related costs, such as fixed equipment expenses.

29.   This requirement to pay capital costs is echoed in applicable New York State regulations - - which are also a crucial component of the federally approved State Medicaid Plan - - specifically in the definition of "patient day," which is the payment unit used in the New York Medicaid program.  Specifically, each nursing home facility in the state is paid a Medicaid rate per patient day.  The State defines "patient day" as "the unit of measure denoting **lodging provided** and services rendered to one patient between the census-taking hour on two successive days."  *See* 10 N.Y.C.R.R. § 86-2.8(a) (emphasis added).  Of course, the State cannot pay for lodging without paying for the cost of the facility in which such lodging occurs.

30.   This undisputable truth has been adopted in the New York State Medicaid Plan under its definition of nursing home "rate," which means "aggregate governmental payment to facilities per patient day as defined in section 86-2.8 of this Subpart, for the care of Medicaid payments which include a direct, indirect, noncomparable **and capital component**."  *See id.* § 86-2.10(a)(6) (emphasis added); *see also id.* § 86-2.10(b) (defining the capital component as a necessary part of the nursing home Medicaid rate); § 86-2.10(g) (the capital component of the rate "shall include" allowable costs, as determined by the Department of Health); § 86-2.10(h) ("A facility's payment rate for 1986 and subsequent rate years shall be equal to the sum of the operating portion of the rate as defined in paragraph (b)(2) of this section and the capital component as defined in subdivision (g) of this section.").

31.   For the two primary sponsorships in the industry, the State Plan rules for capital reimbursement are found in 10 N.Y.C.R.R. § 86-2.19, which applies to non-proprietary facilities,

11

and § 86-2.21, which applies to proprietary facilities. Section 86-2.21 allows for return of actual costs over time during the first 40 years of operation for a proprietary facility.

32. Section 86-2.21 also provides for "residual reimbursement," which allows the Commissioner to set reasonable and appropriate reimbursement for nursing homes beyond their fortieth year of operation, not exceeding 50% of the capital reimbursement received in that fortieth year. *See* 10 N.Y.C.R.R. § 86-2.21(e)(7).

33. The Department of Health, either out of administrative sloth or lack of understanding of its own reimbursement system, had historically set residual reimbursement at 50%, leading to the events underlying this action. At all times the Commissioner had full discretion to set residual reimbursement at any amount below the 50% cap set in 10 N.Y.C.R.R. § 86-2.21, as long as the amount met the necessary costs incurred by the facility in question.

34. Because the Commissioner never utilized this discretion and always set residual reimbursement at 50% of the capital reimbursement received in the facility's last year of so-called "useful life," budget advisors within the State began seeing residual reimbursement as something disproportionate, not tied to actual costs. In truth, the Medicaid rate, for virtually all long-term care providers statewide, has long fallen far short of necessary costs, however, sometimes with a shortfall of 20% or more.

35. This misconception amongst budget advisors and other state actors led the New York State Legislature, in April 2020, to eliminate what the Legislature referred to as "residual equity" as an element of reimbursement for nursing homes that have reached their so-called end of useful life. *See* N.Y. PHL § 2808(20)(d).

12

36. No such payment factor exists, however.  As demonstrated above, Plaintiffs and other similarly situated homes beyond their fortieth year of operation were receiving "residual reimbursement," not "residual equity."

37. It is true that in the industry, the Commissioner's practice of setting residual reimbursement at its maximum, and never exercising any discretion in determining reasonable and proportionate reimbursement to relevant facilities was referred to as "residual equity."  And it is clearly this misapplication of the residual reimbursement rules that the Legislature targeted in N.Y. PHL § 2808(20)(d).  Nothing in the statute indicated a desire on the part of the Legislature to reduce reimbursement for ongoing capital costs incurred by affected facilities to $0.

38. This is likely because the following two mandates of the federally approved State Medicaid Plan remain:  (i) the Department is required, and has since 1979 been required, to adopt and maintain regulations allowing for reimbursement for ongoing capital costs for all facilities, regardless of age; and (ii) each year, and indeed each time that a Medicaid rate issues, the State must undertake a detailed analysis to ensure that the resulting rate is "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."  *See* N.Y. PHL §§ 2808(2-a)(a); 2807(3).  The latter undertaking requires examination of at least seven relevant, factually intensive factors, including actual cost incurred by the facility and whether reimbursement meets that actual cost.  *See id*. § 2807(3) (defining factors to be applied in making adequacy determination for each and every rate schedule submitted to the Division of the Budget for approval).

39. The Commissioner sought federal approval from CMS for elimination of "residual equity" under N.Y. PHL § 2808(20)(d) via a State Plan Amendment ("SPA"), dated June 30,

13

2020 ("SPA #20-0037").  In that SPA, the Commissioner made clear that the intent of N.Y. PHL § 2808(20)(d), and the limited federal approval sought, was to "help reduce **disproportionate reimbursement** of capital expenses once the useful life of a facility has expired," not to eliminate ongoing capital reimbursement to such facilities entirely.  *See* SPA #20-0037, https://www.health.ny.gov/regulations/state_plans/status/ltcare/original/docs/os_2020-06-30_spa_20-37.pdf (emphasis added).

40.    Accordingly, the only methodology change noticed in SPA #20-0037 was elimination of alleged disproportionate reimbursement for capital expenses beyond a proprietary facility's fortieth year of operation, if any, not a 100% reduction in ongoing capital reimbursement to such a facility, in perpetuity.

41.    CMS approved SPA #20-0037, with its specific focus on "disproportionate reimbursement" on September 14, 2020.  This approval allowed for an end to the Commissioner's practice of setting residual reimbursement at the regulatory maximum for all facilities but gave no approval to effect a 100% reduction in such capital reimbursement, once a facility reached its 41st year of operation.

### THE *AARON MANOR* ACTION AND SUBSEQUENT DEVELOPMENTS, POST-DATING THE *AARON MANOR* PLEADING

42.    After adoption of N.Y. PHL § 2808(20)(d), a number of facilities, including certain Plaintiffs, challenged the statute in New York State Supreme Court, alleging that it was: (i) improperly retroactive; (ii) in substantive violation of N.Y. PHL § 2807(3), because the resulting rates were neither reasonable nor adequate to meet necessary costs; and (iii) violative of petitioners' equal protection rights, in that it treated petitioners differently than non-proprietary

homes under 10 N.Y.C.R.R. § 86-2.19.[4]  This suit was captioned *Aaron Manor Rehabilitation and Nursing Center, LLC et al. v. Zucker et al.*, Supreme Court New York, Albany County, Index No. 905032-20 ("*Aaron Manor*").  Petitioners' last pleading in the *Aaron Manor* matter was filed on November 17, 2020, pursuant to a court deadline for amendment set for that date, and therefore did not encompass actions taken, or not taken, by the Commissioner and the New York State Department of Health since that date.

43.    Moreover, *Aaron Manor* did not challenge the Commissioner's federal disclosure obligations under 42 U.S.C. § 1396a(a)(13)(A), because, as detailed below, the Commissioner continued ongoing capital reimbursement for the *Aaron Manor* petitioners through that suit and, indeed, continues such reimbursement today.

44.    The *Aaron Manor* matter was decided on summary judgment initially in material part in petitioners' favor, but ultimately the New York State Court of Appeals in April 2024 decided in favor of the State.  The New York State Court of Appeals denied a motion for reconsideration in September 2024.

45.    In the interim, during the pendency of *Aaron Manor* but not at issue in that suit, several relevant events occurred in relation to capital reimbursement for Plaintiffs.  To begin with, the State continued reimbursing Plaintiffs for rate years 2021 and beyond for their ongoing capital costs via residual reimbursement, although they were under no court-ordered obligation to do so.

46.    Specifically, the Supreme Court issued a permanent injunction in *Aaron Manor* on the issue of retroactivity on June 1, 2021.  After that point, the only restriction that Defendant faced concerning residual reimbursement in relation to the *Aaron Manor* petitioners was that

---

[4] Petitioners in the *Aaron Manor* matter also sought relief under a clause allowing the State to delay implementation of the statute, which became moot during the proceedings.

15

Defendant had to give 60 days' advance notice of any change made in that regard, as required under existing law, N.Y. PHL § 2807(7).

47.   Despite this, the Commissioner continued reimbursing the *Aaron Manor* petitioners for their ongoing capital costs, despite the elimination of residual equity.  And each time Defendant did so, Defendant certified that such reimbursement was necessary and appropriate under N.Y. PHL § 2807(3).  Moreover, the process used by the Commissioner to continue capital reimbursement followed the notice and comment procedures required under 42 U.S.C. § 1396a(a)(13)(A), *i.e.*, providing Notice Rates that followed the methodology and justifications set forth in 10 N.Y.C.R.R. § 86-2.21.

48.   Meanwhile, in other, unrelated litigation, it was revealed that the Department of Health had apparently not conducted the analysis required of it under N.Y. PHL § 2807(7) since at least first Clinton administration.  Because the *Aaron Manor* matter was decided before any discovery could be conducted, the *Aaron Manor* petitioners were unable to demonstrate this gross procedural neglect on the part of the Department.

49.   And then in 2020 and 2024 respectively, the New York Legislature adopted first a 5% and then an additional 10% reduction in overall capital reimbursement, reducing the amounts paid to nursing homes for ongoing capital costs, but preserving the majority of such reimbursement as proportionate, reasonable and necessary.  *See* L. 2024, Ch. 57, § 1, Part E, § 2; L. 2020, Ch. 56, § 1, Part NN, § 1.  These incremental reductions and the resulting preservation of the majority of capital reimbursement for New York nursing homes were made part of the federally approved State Medicaid Plan.

50.   Despite this, in November 2024, the Department issued so-called "Notice Rates," providing, under 42 U.S.C. § 1396a(a)(13)(A) and N.Y. PHL § 2807(7), the 60-day advance

notice of rates to be paid in rate-year 2025. For the majority of Plaintiffs, these "Notice Rates" showed a 100% reduction in reimbursement for ongoing capital costs when compared to their 2024 rates. This was contrary to the Legislature's clear intent to maintain capital reimbursement generally, but at what the Legislature saw as a more proportionate rate.

51. And in the "Notice Rates," the Commissioner failed to provide any explanation of either the methodology by which the State determined such an elimination of capital reimbursement to be appropriate, or the justification for any determination made under such methodology. These requirements, however, are made part of 42 U.S.C. § 1396a(a)(13)(A), mandating not only that the Commissioner provide notice of proposed rates, but that he also "show his work" concerning how such proposed rates were determined.

52. These "Notice Rates," lacking any reimbursement for ongoing capital expenses, will be paid to Plaintiffs sometime in 2025, effective as of January 1, 2025, although they likely will be finalized at some date after that. By way of comparison, the 2024 "Notice Rates" were adopted as final rates on June 20, 2024, made retroactive to January 1 of that year.

53. Upon information and belief, Defendant has conducted no study, analysis, comparison or other calculation required under 42 U.S.C. § 1396a or N.Y. PHL § 2807(3) to determine whether the resulting "Notice Rates" to Plaintiffs would be proportionate, reasonable and adequate to meet the necessary costs of care, including the necessary costs for the facilities in which Plaintiffs' residents live and receive their care. Nor has any such study ever been made public or available to Plaintiffs under 42 U.S.C. § 1396a(a)(13)(A).

54. As a result, Plaintiffs have been materially hindered in their ability to object to their rates as substantially insufficient, including via the federally mandated process ensuring "prompt administrative review" of their rates. *See* 42 C.F.R. § 447.253(e); *see also* 42 U.S.C.

§ 1396a(a)(28)(C) (requiring the State to "make available to the public the data and methodology used in establishing payment rates for nursing facilities").

## UNEQUAL TREATMENT OF PLAINTIFFS WHEN COMPARED TO SIMILARLY SITUATED HOMES

55.     The *Aaron Manor* petitioners asserted that they were similarly situated with voluntary facilities under the specific capital reimbursement rules governing voluntary facilities, to wit 10 N.Y.C.R.R. § 86-2.19, in relation to the pending rate change projected for rate-year 2020. That argument was rejected.

56.     In the interim, in an unrelated matter, the New York Supreme Court, Appellate Division, Third Department, determined that, regardless of corporate form, proprietary facilities are similarly situated with other proprietary facilities under an equal protection analysis. *See Brightonian Nursing Home, Inc. v. Zucker*, 212 A.D.3d 162, 167 (3d Dep't 2023).

57.     This suit compares Plaintiffs, who are all proprietary homes with facilities that have been in operation for at least 35 years and now face complete cessation of reimbursement for ongoing capital costs at the end of their so-called "useful lives," with all other proprietary homes in the state that have been operating for 34 years or fewer, and still receive such capital reimbursement.

58.     Plaintiffs include facilities with between at least 35 and 40 years of operation because of the specific manner in which capital reimbursement is conducted in New York, and the planning necessary to transition to capital reimbursement after expiry of a facility's so-called useful life.

59.     Specifically, capital reimbursement is paid on a two-year lag, such that reimbursement for a project completed and paid for in a given year "1" begins two years later, in the resulting

18

year "3."  Hence, the addition of Plaintiffs in their 38th and 39th years of operation, before expiry of their so-called useful life.

60.    And, as anyone involved on a construction project knows, construction takes time to plan, obtain approvals for, finance, and commence.  Hence, the three additional years added to the class of facilities included in this action, *i.e.*, facilities in their 35th, 36th, and 37th years of operation.

61.    As correctly determined in *Brightonian*, Plaintiffs are all similarly situated with other proprietary facilities with fewer years of operation, in that they are all proprietary facilities, providing constitutionally mandated care to the State's most vulnerable residents, and face the same costs in providing that care, specifically when it comes to providing a safe, comfortable, home-like environment in which residents can exercise the full breadth of their abilities and maximum amount of self-determination.

62.    Indeed, many Plaintiffs are part of jointly managed groups of homes on both sides of this age divide, with homes nearing or beyond the end of their so-called useful lives having the same manner of capital reimbursement needs as those who have not yet reached that milestone.

63.    As will be demonstrated in this suit, however, there is no magical clock that strikes twelve when a facility reaches its fortieth year of operation, changing a vibrant, useful, valuable facility into a reimbursement pumpkin.  Rather, facilities remain crucial participants of the senior-care continuum well beyond their fortieth year of operation, as demonstrated by the facts that:  (i) the State still authorizes them to operate in what is perhaps the most highly regulated care vertical in the state; and (ii) numerous Plaintiffs are regularly ranked by the State as being some of the highest quality providers available.  It cannot be said that a duly licensed facility

demonstrating the highest level of quality in the state has exceeded its "useful life" as a Medicaid provider.

64.    Indeed, the Department of Health has gone so far as to specifically recommend certain facilities to residents, including the first named Plaintiff herein, as being amongst the highest quality providers in the state.  The State's list of these providers, which appears on the Department of Health's website, is attached hereto as **Exhibit A**.  *See* Ex. A hereto (listing "Top-Performing Nursing Homes" and including Plaintiff Kings Harbor Multicare Center on its listing).

65.    Nowhere on its website, however, does the Department warn residents or their families that it will no longer provide, *i.e.*, pay for, lodging for nursing home residents in these high-quality facilities, or, indeed, in any facility statewide.  To the contrary, the Department of Health assures all residents that they have the right to "dignity, respect and a comfortable living environment," which of course can only occur in a well-maintained physical facility.  *See* "Your Rights as a Nursing Home Resident in New York State," https://www.health.ny.gov/facilities/nursing/rights/ (last accessed December 23, 2024).[5]

66.    And beyond this, although the current prospective rate-setting system in New York is intended, *inter alia,* to encourage Medicaid program savings, the State may not use budgetary savings as the sole criteria for determining whether a cost is necessary for care, and therefore allowable, under the State Plan.  Rather, the federal mandates of 42 U.S.C. § 1396a apply, which

---

[5] It must be remembered in this regard that the ultimate provider of care to residents receiving Medicaid assistance is the State, under its Constitutional mandate found at N.Y. Const. Art. XVII, § 1.  The State has chosen to provide such care, including lodging of residents, through its federally approved Medicaid Plan.

require transparency and due process, as well as substantive equivalence in services provided in a manner that ensures ongoing access to care in a geographic region.

67.    Because the payment of $0 in perpetuity for the residential portion of residential long-term care is irrational on its face, Defendant's disparate treatment of Plaintiffs via-a-vis younger proprietary facilities lacks rational basis.[6]

68.    In addition, and unfortunately, this disparate treatment has been driven by animus: animus from the executive branch, which has long held an unwarranted, negative view toward proprietary nursing homes.

69.    In relation to residual reimbursement, this animus was fueled, *inter alia*, by the Commissioner's own failure to exercise any discretion or judgment in relation to residual reimbursement amounts, always setting them at the maximum amount allowable, rather than determining on a case-by-case basis what level of capital reimbursement aligns with a given facility's actual costs.[7]

---

[6] Moreover, to the extent Defendant reads the federal approval of SPA #20-0037 as requiring a 100% reduction in reimbursement for ongoing capital expenses to Plaintiffs, rather than just removal of a payment factor to address potential disproportionate reimbursement, such a reading lacks rational basis, as CMS did not in any way approve a 100% reduction in such capital reimbursement to Plaintiffs.  To the extent that it was the intent of CMS in its approval of SPA #20-0037 to mandate such a reduction, Plaintiffs reserve their rights to seek relief against CMS, as such action would be arbitrary and capricious, given the necessary nature of capital reimbursement in New York.

[7] Plaintiffs contend that the reimbursement paid to them has always been proper, given the huge provider losses inherent in the Medicaid system.  The Commissioner may well have been trying to supplement facially insufficient Medicaid rates by setting residual reimbursement at its regulatory maximum.  That does not mean that these facilities, and their residents, must now be punished for the Commissioner's past actions with disproportionately lower reimbursement. This is especially so, given that the Commissioner and his predecessors have repeatedly certified, under N.Y. PHL § 2807(3), that residual reimbursement paid since inception of the program was both reasonable and adequate under the circumstances.

70.    The Commissioner's failure in this regard apparently triggered a knee-jerk reaction in the Department, eliminating reimbursement for ongoing capital costs entirely rather than determining the proportionate amount of capital reimbursement to pay to Plaintiffs and other similarly situated facilities.

71.    In doing so, the Department is ignoring the requirements placed upon in it by New York and federal law, including the obligation under 42 U.S.C. § 1396a(a)(13)(A) to provide transparent and meaningful due process in relation to both the methodology and justification used to determine whether the rates paid to nursing homes are proportionate and sufficient.

72.    And upon information and belief, the Department of Health, in both internal and external communications, has acknowledged that facilities beyond their fortieth year of operation have a right and need to receive ongoing capital costs.  These communications were never disclosed in the *Aaron Manor* matter, however, given that the *Aaron Manor* matter was decided summarily, without the opportunity for discovery.

73.    Given that:  (i) ongoing capital costs are necessary to the operation of a nursing home beyond its fortieth year of operation; (ii) Defendant is obligated to pay the proportionate and necessary costs of constitutionally mandated care that the State provides through the Medicaid program; (iii) Plaintiffs now face a 100% reduction in their relevant capital reimbursement, while the vast majority of capital reimbursement for homes with fewer years of operation continues; (iv) Plaintiffs are similarly situated with other for-profit homes with fewer years of operation; (v) no rational basis exists for this disparate treatment; and (vi) the disparate treatment was motivated by animus against Plaintiffs, the elimination of ongoing capital reimbursement from Plaintiffs' Medicaid rates violates their right to equal protection under the law.

## VIOLATION OF DUE PROCESS UNDER THE MEDICAID PROGRAM

74.   The State Medicaid Plan must meet stringent federal requirements, including the requirements that:

(i)   proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,

(ii)   providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications, [and then]

(iii)   final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published[.]

*See* 42 U.S.C. § 1396a(a)(13)(A).

75.   In relation to Plaintiffs' capital rates, as shown in their recent Notice Rates, nowhere has the State complied with 42 U.S.C. § 1396a(a)(13)(A) and disclosed the methodology by which it determined that paying nothing for resident lodging and related upkeep, refurbishment, and improvement of the nursing-home facility would be proportionate, reasonable, and appropriate under the Medicaid program, and would result in high quality care comparable to that available to non-Medicaid recipients as well as continued access to such care.

76.   Nor has the State provided any justification as to why a resident at any one of Plaintiffs' homes should lose funding for upkeep of her lodging from one day to the next, simply because the facility in which she lives has exceeded its fortieth year of operation.

77.   Because of this, relevant stakeholders - - which include Plaintiffs, their residents, their residents' representatives and any other concerned resident of the State - - have had no opportunity to review or comment on the proposed rates, the underlying methodologies, or any

23

alleged justifications or supporting data.  It is, of course, beyond question that a concerned stakeholder cannot review and comment on that which has neither been done nor disclosed.

78.    And the Notice Rates are slated to become effective as of January 1, 2025.  Time is therefore quickly running out before the State's administrative and apparently *ad hoc* fiat in relation to Plaintiffs' ongoing capital reimbursement becomes final.

79.    And lastly, the State has not even followed its own substantive rules in relation to determining the proportionate amount to be included in the capital component mandated as part of Plaintiffs' Medicaid rates.

80.    Specifically, under N.Y. PHL § 2807(3), the Department of Health is required to:

> determine, and in the case of approvals by the state director of the budget, certify to such official that the proposed rate schedules for payments to hospitals[8] for hospital and health-related services are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.  In making such certification, the commissioner shall take into consideration the elements of cost, geographical differentials in the elements of cost considered, economic factors in the area in which the hospital is located, the rate of increase or decrease of the economy in the area in which the hospital is located, costs of hospitals of comparable size, and the need for incentives to improve services and institute economies.  The commissioner shall also take into consideration the economies and improvements in service to be anticipated from the operation of joint central service or use of facilities or services which may serve as alternatives or substitutes for the whole or any part of in-hospital service, including, but not limited to, obstetrical, pediatric, laboratory, training, radiology, pharmacy, laundry, purchasing, preadmission, nursing home, ambulatory or home care services.

*See* N.Y. PHL § 2807(3).

81.    This is a factually intensive process, involving at least seven categorical elements, *e.g.*, cost, geographic differentials in cost, local economic factors and the need for incentives to improve services and institute economies.  It is also a recurring process, required with every

---

[8] Under New York law, a nursing home is included under the definition of "hospital" under Article 28 of the Public Health Law.  *See* N.Y. PHL § 2801(1).

submission of "proposed rate schedules" under 42 U.S.C. § 1396a(a)(13)(A)(i), which includes the November 2024 Notice Rates at issue herein.

82. The last record evidence of the Department ever having conducted this analysis dates from 1993, however, which the Department apparently at one time trended forward to 2003.

83. When recently challenged with the allegation that the Department has not conducted this analysis in years, perhaps decades, the Department was silent, confirming the industry's fears that the Department has been asleep at the proverbial switch, when it comes to determining adequacy of the nursing home reimbursement rate.

84. This is not surprising, however, as the Department has lost - - either through attrition or otherwise - - much of its prior institutional knowledge and experience in relation to rate setting. Professionals in the field regularly complain that the Department does not seem to know how its own rate-setting system works, nor the requirements placed upon it by the State's own, federally approved Medicaid Plan.

85. Indicative of this lack of adequate and informed staff is the Department's ongoing rate appeal backlog and its recent, over-12-year delay in promulgating regulations required by the Legislature to alleviate that backlog. Specifically, because of the Department's lack of adequate, informed staff, thousands of nursing home Medicaid rate appeals, totaling tens of millions of dollars in unpaid reimbursement, languished for years, sometimes decades. Prompt administrative review of such appeals is mandated, however, under 42 U.S.C. § 1396a(a)(28), § 1396a(a)(37), and 42 C.F.R. § 447.253(e).

86. In 2011, the New York State Legislature mandated that the Department of Health adopt rules to alleviate this backlog. The Department, however, ignored that mandate for over a decade, only proposing the rules mandated by the Legislature over 12 years later, after certain

Plaintiffs, together with certain other facilities, sought and obtained a court order mandating such action.

87.    The missing regulations were then finally adopted as of October 30, 2024, but the appeals backlog continues, further undermining Plaintiffs' due process rights in relation to capital rate setting.  Indeed, the Department has determined, *ad hoc*, that it will not entertain appeals based upon so-called "methodology," despite the fact that 42 U.S.C. § 1396a(a)(13)(A)(ii) requires that the State provide Plaintiffs with a "reasonable opportunity for review and comment on" proposed rates.

88.    This creates a very real Catch-22 for Plaintiffs, where providers are told to appeal rates with which they do not agree on programmatic grounds, including methodology and the State's failure to follow its own rules in relation to reimbursement, but the Department refuses to hear any such appeal, thereby eliminating any ability to exercise their due process rights.

**FIRST CAUSE OF ACTION**
**EQUAL PROTECTION**
**(Declaratory and Injunctive Relief)**

89.    Plaintiffs repeat the forgoing allegations as if fully restated herein.

90.    As determined by the Appellate Division, Third Department in *Brightonian* and supported by the facts at issue in this action, Plaintiffs are similarly situated to other proprietary homes with fewer years of operation, when determining the appropriate and proportionate level of reimbursement for ongoing capital costs.

91.    This is because, regardless of whether a facility is one or forty-one years old, costs for facility upkeep, purchase and replacement of major, fixed equipment, and other costs arising from providing full-time lodging for residents in a comfortable, safe, home-like environment are core, necessary costs in the provision of residential health care.

92.    Despite this, the State has issued an *ad hoc* reduction of Plaintiffs' reimbursement rate for ongoing capital costs of 100%, whereas other for-profit facilities continue to receive the vast majority of their capital reimbursement.

93.    Such a reduction, however, is supported nowhere in the federally approved State Medicaid Plan, nor the applicable New York statutes and regulations that implement that Plan. Rather, the approved SPA targets alleged "disproportionate reimbursement" and says nothing about a 100% reduction in ongoing capital reimbursement in perpetuity, regardless of actual capital costs that arise.

94.    Moreover, this *ad hoc* reduction is arbitrary, capricious, and irrational, as it:  (i) fails to satisfy the requirements of the State's own Medicaid Plan; (ii) was conducted blindly, apparently as an misinterpretation of the Legislature's limited action under N.Y. PHL § 2808(20)(d); (iii) was not preceded by required analysis and certification under N.Y. PHL § 2807(3); and (iv) otherwise endangers residents without their knowledge, disincentivizes investments in older nursing home properties, and adversely impacts access to care in the current environment, where a resident can wait weeks before finding an appropriate nursing home placement.

95.    And beyond its lack of rational basis, Defendant's recent actions, as reflected in Plaintiffs' November 1, 2024 Notice Rates, was motivated by animus toward Plaintiffs, singling out the most vulnerable providers in a sponsorship that the Department already, improperly, regards with disdain.

96.    Accordingly, Plaintiffs seek judgment in their favor declaring that such elimination violates Plaintiffs' equal protection rights, specifically their right to proportionate reimbursement under the Social Security Act, the federally approved New York State Medicaid Plan, and its implementing statutes and regulations.  Plaintiffs also seek injunctive relief barring such

elimination on a prospective basis, including via any future revision of Plaintiffs relevant capital reimbursement rates to $0 for rate years 2020 to 2024.

97.    Plaintiffs further seek their reasonable attorneys' fees and other disbursements in prosecution their equal protection claim under 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**
**DUE PROCESS**
**(Declaratory and Injunctive Relief)**

98.    Plaintiffs repeat the forgoing allegations as if fully restated herein.

99.    The federal/state Medicaid program incorporates, as one of its core principles, a process for ensuring transparency and due process in Medicaid rate setting.  This process is found in 42 U.S.C. § 1396a(a)(13)(A), which requires participating state agencies to disclose and provide meaningful notice of and the ability to comment on rates, their underlying methodologies, and the justifications for same, if any.

100.   As part of these justifications, participating state agencies, such as Defendant's Department of Health, are required to disclose how a Medicaid rate will satisfy the substantive requirements of the program, which include provision of high-quality care, incentivizing access to such care, and ensuring continued access in relevant geographic regions.  *See* 42 U.S.C. § 1396a(a)(30).

101.   In Plaintiffs' recent Notice Rates, Defendant, without any advance notice or disclosure of underlying methodologies or justifications, indicated his intent to reduce Plaintiffs' reimbursement for ongoing capital expenses by 100%, compared to the recent 5% and 10% reductions to which the rest of the industry was limited.[9]

---

[9] The Notice Rates were accompanied by a so-called "Dear Administrator Letter" that stated simply that: "residual equity is no longer included in the capital rates."  It did not disclose any methodology used to determine that complete elimination of relevant capital reimbursement to Plaintiffs would be reasonable or adequate under the State Medicaid Plan, nor did it provide any

28

102.  The *ad hoc* deadline set by the Department for facilities to respond to these Notice Rates ran on December 6, 2024, providing Plaintiffs and other concerned stakeholders no opportunity whatsoever to review and comment upon the elimination of relevant capital reimbursement from Plaintiffs' rates, specifically because the methodology and justification, if any, behind the proposed rates was never disclosed.

103.  Moreover, in calculating Plaintiffs' rates so as not to include any reimbursement at all for ongoing capital costs, Defendant did not take the step mandated by Defendant's own federally approved State Medicaid Plan of applying at least seven factually intensive factors to determine whether the resulting rate will be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operates facilities."  *See* N.Y. PHL § 2807(3).

104.  Nor has the Commissioner made any determination that the resulting rates, now devoid of capital reimbursement, satisfy the substantive requirements of 42 U.S.C. § 1396a(a)(30).

105.  As a result, Defendant's actions have violated Plaintiffs' rights under 42 U.S.C. § 1396a(a)(13)(A) and the Fifth and Fourteenth Amendments to the United States Constitution.

106.  Plaintiffs therefore seek declaratory and prospective injunctive relief in relation to such actions:  (i) declaring Defendant's actions to be violative of Plaintiffs' due process rights; and (ii) enjoining finalization of any rate for Plaintiffs eliminating reimbursement for ongoing capital costs that does not satisfy the requirements of 42 U.S.C. § 1396a(a)(13)(A), the process set forth under N.Y. PHL § 2807(3), and constitutional due process.

107.  Plaintiffs further seek such relief in relation to any prospective efforts by Defendant to reduce Defendant's relevant capital rates paid between April 2020 and December 2024 to $0,

justification of its determination, both of which disclosures are required under 42 U.S.C. § 1396a(a)(13)(A).

which Defendant had certified as reasonable and adequate to meet Plaintiffs' necessary costs, under N.Y. PHL § 2807(3).

108.  Plaintiffs further seek their reasonable attorneys' fees and other disbursements in prosecution their equal protection claim under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor:

i.      declaring that Defendant's recent actions to reduce Plaintiffs' reimbursement for ongoing capital costs by 100% are unconstitutional, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, because they fail to afford Plaintiffs equal protection under law; and prospectively enjoining any action to implement such reduction, including any prospective reduction of relevant capital reimbursement paid to Plaintiffs between April 2020 and December 2024 to $0;

ii.      declaring that Defendant's failure to disclose the methodologies and justifications behind its recent *ad hoc* reduction of capital reimbursement to Plaintiffs, and its failure to satisfy its obligation under N.Y. PHL § 2807(3) before issuing or finalizing its recent Notice Rates, both violate 42 U.S.C. § 1396a(a)(13)(A) and Plaintiffs' right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and prospectively enjoining any action to eliminate reimbursement for necessary ongoing capital costs or reduce Plaintiffs' relevant capital reimbursement paid between April 2020 and December 2024 to $0, without satisfaction of Defendant's duties in relation to same; and

30

iii.    awarding Plaintiffs the costs and disbursements of this proceeding, as well as their

reasonable attorneys' fees herein under 42 U.S.C. § 1988, and such other and further relief as the

Court deems just, necessary, and appropriate.

Dated:  Rochester, New York                            **HARTER SECREST & EMERY LLP**
        December 24, 2024


                                              By:  /s/ F. Paul Greene
                                                   F. Paul Greene
                                                   Bar Roll No. 302864
                                                   Christina M. Deats
                                                   Bar Roll No. 519729
                                                   *Attorneys for Plaintiffs*
                                                   1600 Bausch & Lomb Place
                                                   Rochester, New York  14604-2711
                                                   Telephone:  (585) 232-6500
                                                   Email:  fgreene@hselaw.com
                                                           cdeats@hselaw.com

31