UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────

BRONX HARBOR HEALTH CARE COMPLEX,
INC., d/b/a Kings Harbor Multicare Center, *et al*.,

                     Plaintiffs,

                                            1:24-CV-1573
v.                                     (GTS/PJE)

JAMES V. McDONALD, M.D., M.P.H., as
Commissioner of Health of the State of New York,
or his predecessor or successor in office,

                     Defendant.

─────────────────────────────────────────

APPEARANCES:                          OF COUNSEL:

HARTER, SECREST & EMERY LLP       CHRISTINA M. DEATS ESQ.
   Counsel for Plaintiffs               FRANCIS P. GREENE, ESQ.
1600 Bausch and Lomb Place
Rochester, NY 14604

HON. LETITIA A. JAMES               TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York   JOHN C. JENSEN, ESQ.
   Counsel for Defendant              KYLE W. STURGESS, ESQ.
300 South State Street, Suite 300      Assistant Attorneys General
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

### DECISION and ORDER

      Currently before the Court, in this civil rights action filed by the operators of 92 for-profit

nursing homes located in and licensed by the State of New York ("Plaintiffs")[1] against

─────────────

[1]      The 92 Plaintiffs in this action are as follows: (1) Bronx Harbor Health Care Complex,
Inc., doing business as Kings Harbor Multicare Center; (2) Abraham Operations Associates LLC
doing business as Beth Abraham Center for Rehabilitation and Nursing; (3) Absolut Center for
Nursing and Rehabilitation at Allegany, LLC; (4) Absolut Center for Nursing and Rehabilitation
at Aurora Park, LLC; (5) AURNC Operating, LLC doing business as Auburn Rehabilitation &

Nursing Center; (6) Avon Nursing Home, LLC; (7) Bainbridge Nursing and Rehabilitation Center, LLC; (8) Beach Terrace Care Center, Inc., doing business as Beach Terrace Care Center; (9) Betsy Ross Rehabilitation Center, Inc., doing business as Betsy Ross Nursing & Rehab Center; (10) Boro Park Operating Co, LLC doing business as Boro Park Center for Rehabilitation & Healthcare; (11) BVRNC Operating, LLC doing business as Sodus Rehabilitation & Nursing Center; (12) CLR Carthage LLC doing business as Carthage Center for Rehabilitation and Nursing; (13) CLR Glens Falls, LLC doing business as Glens Falls Center for Rehabilitation and Nursing; (14) CLR Minoa, LLC doing business as Onondaga Center for Rehabilitation and Nursing; (15) CLR New Paltz, LLC doing business as New Paltz Center for Rehabilitation and Nursing; (16) CLR Troy, LLC doing business as Troy Center for Rehabilitation and Nursing; (17) Comprehensive at Orleans, LLC doing business as The Villages of Orleans Health and Rehabilitation Center; (18) Comprehensive at Williamsville, LLC doing business as Comprehensive Rehabilitation and Nursing Center at Williamsville; (19) Conesus Lake Nursing Home, LLC; (20) Delaware Operations Associates LLC doing business as Buffalo Center for Rehabilitation and Nursing; (21) DOJ Operations Associates LLC doing business as Triboro Center for Rehabilitation and Nursing; (22) Dry Harbor HRF, Inc., doing business as Dry Harbor Nursing Home; (23) DURNC Operating, LLC, doing business as Dunkirk Rehabilitation & Nursing Center; (24) East Haven Nursing and Rehabilitation Center, LLC; (25) EDRNC Operating, LLC doing business as Eden Rehabilitation & Nursing Center; (26) Essex Operations Associates LLC doing business as Essex Center for Rehabilitation and Healthcare; (27) Fulton Operations Associates, LLC doing business as Fulton Center for Rehabilitation and Healthcare; (28) Garden Gate Health Care Facility, LLC; (29) Grandell Rehabilitation and Nursing Center, Inc., doing business as Grandell Rehabilitation and Nursing Center; (30) GRNC Operating LLC doing business as Ghent Rehabilitation & Nursing Center; (31) Hamilton Manor Nursing Home, LLC; (32) Haven Manor Health Care Center, LLC; (33) Highland Care Center, Inc.; (34) Hollis Operating Co., LLC doing business as Holliswood Center for Rehabilitation and Healthcare; (35) HORNC Operating, LLC doing business as Houghton Rehabilitation & Nursing Center; (36) HRNC Operating, LLC doing business as Highland Rehabilitation and Nursing Center; (37) IR Operations Associates LLC doing business as Granville Center for Rehabilitation and Nursing; (38) Kaaterskil Operating LLC doing business as Greene Meadows Nursing and Rehabilitation Center; (39) Latta Road Nursing Home East, LLC; (40) Latta Road Nursing Home West, LLC; (41) Leroy Operating LLC doing business as Leroy Village Green Nursing and Rehabilitation Center; (42) Meadow Park Rehabilitation & Health Care Center, LLC; (43) Montgomery Operating Company, LLC doing business as Montgomery Nursing and Rehabilitation Center; (44) Mosholu Parkway Nursing & Rehabilitation Center, LLC; (45) New Vanderbilt Rehabilitation and Care Center, Inc.; (46) Newark Manor Nursing Home, Inc.; (47) Oceanside Care Center, Inc., doing business as Oceanside Care Center; (48) Ontario Operations Associates LLC doing business as Ontario Center for Rehabilitation and Healthcare; (49) Optima Care Little Neck, LLC doing business as Little Neck Care Center; (50) Optima Care Smithtown, LLC doing business as Brookside Multicare Nursing Center; (51) Optima Care White Plains, LLC doing business as White Plains Center for Nursing Care; (52) ORRNC Operating, LLC doing business as Orchard Rehabilitation & Nursing Center; (53) Palffy Group LLC doing business as Alpine Rehabilitation and Nursing Center; (54) Park Manor Acquisition II, LLC doing business as Middletown Park Rehabilitation

2

Commissioner of Health for the State of New York James V. McDonald ("Defendant"), is

Plaintiffs' motion for an Order preliminarily enjoining Defendants, pursuant to Fed. R. Civ. P.

65, from taking any action to eliminate the ongoing capital reimbursement of Plaintiffs on line 60

of their Medicaid rate sheets, including as indicated in the so-called "Notice Rates" issued to

Plaintiffs on or about November 1, 2024, or via recoupment of amounts paid under line 60

---

& Health Care Center; (55) Parkview Operating Co., LLC doing business as Westchester Center for Rehabilitation & Nursing; (56) Pavilion Operations LLC doing business as Corning Center for Rehabilitation and Healthcare; (57) Penfield Place, LLC; (58) Pharney Group, LLC doing business as Tarrytown Hall Care Center; (59) Pine Haven Operating, LLC doing business as Pine Haven Home; (60) PRNC Operating LLC doing business as Plattsburgh Rehabilitation and Nursing Center; (61) Putnam Operating Acquisition I, LLC doing business as Putnam Nursing & Rehabilitation Center; (62) Queens-Nassau Nursing Home, Inc., doing business as Queens Nassau Rehabilitation and Nursing Center; (63) Ralex Services, Inc., doing business as Glen Island Center for Nursing and Rehabilitation; (64) Regeis Care Center, LLC doing business as Regeis Care Center; (65) River Ridge Operating LLC doing business as River Ridge Living Center; (66) Rockaway Operations Associates, LLC doing business as Far Rockaway Center for Rehabilitation and Nursing; (67) S&J Operational, LLC doing business as Mills Pond Nursing and Rehabilitation Center; (68) Salem Acquisition I, LLC doing business as Salem Hills Rehabilitation and Nursing Center; (69) Sapphire Center for Rehabilitation and Nursing of Central Queens, LLC; (70) SARNC Operating, LLC doing business as Salamanca Rehabilitation & Nursing Center; (71) Schnur Operations Associates LLC doing business as Martine Center for Rehabilitaiton and Nursing; (72) Seneca Health Care Center, LLC; (73) Seneca Nursing & Rehabilitation Center, LLC; (74) Sky View Rehabilitation and Health Care Center, LLC; (75) South Shore Rehabilitation, LLC doing business as South Shore Rehabilitation and Nursing Center; (76) Susquehanna Nursing & Rehabilitation Center, LLC; (77) SV Operating Three, LLC doing business as Richmond Center for Rehabilitation and Specialty Healthcare; (78) The Brightonian, Inc.; (79) The Hurlbut, LLC doing business as The Hurlbut; (80) The Shore Winds, LLC doing business as The Shore Winds; (81) URNC Operating, LLC doing business as Utica Rehabilitation & Nursing Center; (82) Warren Operations Associates LLC doing business as Warren Center for Rehabilitation and Nursing; (83) Wartburg Receiver LLC doing business as Bushwick Center for Rehabilitation and Health Care; (84) Washington Operations Associates LLC doing business as Washington Center for Rehabilitation and Healthcare; (85) Waterfront Operations Associates LLC doing business as Ellicott Center for Rehabilitation and Nursing; (86) Waterview Acquisition 1, LLC doing business as Waterview Hills Rehabilitation and Nursing Center; (87) Wayne Center for Nursing & Rehabilitation, LLC; (88) West Lawrence Care Center, LLC; (89) Westgate Operations Associates, LLC doing business as Rochester Center for Rehabilitation and Nursing; (90) Williamsville Suburban, LLC; (91) Woodside Manor Nursing Home, Inc.; and (92) YRNC Operating, LLC doing business as Yorktown Rehabilitation & Nursing Center.   (Dkt. No. 1.)

between April 2020 and December 2024, during the pendency of this action.   (Dkt. No. 18.)

Defendant has opposed Plaintiffs' motion, Plaintiffs have replied to that opposition, and a

hearing on the motion has been held.   (Dkt. Nos. 24, 27; Text Minute Entry for Dec. 9, 2025.)

For the reasons set forth below, Plaintiffs' motion for a preliminary injunction is granted.

## I.    PLAINTIFFS' COMPLAINT

Generally, in their Complaint, Plaintiffs allege that they are 92 for-profit nursing homes

which participate in the federal/state Medicaid program, and which have exceeded (or are about

to exceed) their so-called "useful life" of 40 years, as determined by the New York State

Department of Health ("Department").   (Dkt. No. 1, at ¶ 3.)   Plaintiffs further allege that, on or

about November 1, 2024, the Department issued a notice to them informing them of a 100%

reduction in ongoing capital reimbursement for all for-profit facilities that have been in operation

for 40 years or more.   (*Id*. at ¶¶ 8, 18, 31.)

Based on these factual allegations, Plaintiffs asserts two claims: (1) a claim under 42

U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment, based on the

assertion that (a) Plaintiffs are similarly situated to other for-profit nursing homes with fewer

years of operation (for purposes of determining the appropriate and proportionate level of

reimbursement for ongoing capital costs), and (b) the State's reduction is arbitrary, capricious,

and irrational (and indeed motivated by animus toward Plaintiffs); and (2) a claim under 42

U.S.C. § 1983 and either the Due Process Clause of the Fifth and Fourteenth Amendments or 42

U.S.C. § 1396a(a)(13)(A), based on the assertion that (a) Defendant has failed to disclose the

methodologies/justifications for the 100% reduction, (b) Defendant has denied Plaintiffs of a

reasonable opportunity to review/comment, and (c) Defendant has failed to conduct a N.Y.

Public Health Law § 2807(3) analysis and to determine compliance with 42 U.S.C. §

1396a(a)(30).    (*Id.* at ¶¶ 89-108.)

## II.    GOVERNING LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ."    *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted).    Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief.    *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success.    *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987).    "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits.    *See, e.g., Ligon v.*

*City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing

"hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities");

*Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011)

(considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the

equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214,

1999 WL 34981557, at \*4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and

the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New*

*York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as

"requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the

harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y.1967)

(explaining that, in order to "balance the equities," the court "will consider the hardship to the

plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will

be subjected") [internal quotation marks omitted].[2]

        With regard to the second part of the first element, "[a] sufficiently serious question as to

the merits of the case to make it a fair ground for litigation" means a question that is so

"substantial, difficult and doubtful" as to require "a more deliberate investigation."  *Hamilton*

*Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc.*

*v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[3]  "A balance of hardships tipping

---

[2]        *See also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992)
("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though
the *undiscounted* balance of harms favors Y.") [emphasis added].

[3]        *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.
1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute*
*v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v.*

decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[4]

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc.*

---

*Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

[4]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor.  *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

*v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." *Black's Law Dictionary* at 1350 (9th ed. 2009).

The Second Circuit recognizes three limited exceptions to the above-stated general standard.  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.  *Id*. (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial.  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New*

*York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[5]   As for the point in time that serves as the *status quo*, the Second Circuit has defined this point in time as "the last actual, peaceable uncontested status which preceded the pending controversy."  *LaRouche v. Kezer*, 20 F.3d 68, 74, n.7 (2d Cir. 1994); *accord, Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014); *Actavis PLC*, 787 F.3d at 650.

Because the parties have demonstrated in the memoranda of law an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this legal standard in this Decision and Order, which is intended primarily for the review of the parties.

## III.    ANALYSIS

### A.    *Burford* Abstention

Generally, in his opposition memorandum of law, Defendant argues that, as a threshold

---

[5]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

matter, the Court should abstain from adjudication of this dispute under *Burford v. Sun Oil Co.*,

319 U.S. 315 (1943),[6] for the following three reasons: (1) the first applicable *Burford* "factor"

(i.e., the degree of specificity of the state regulatory scheme) weighs in favor of abstention,

because the state regulatory scheme is extensive and complex, and timely and adequate state-

court review is available (i.e., through an Article 78 proceeding); (2) the second applicable

*Burford* "factor" (i.e., the necessity of discretionary interpretation of state statutes) weighs in

favor of abstention, because Plaintiffs' action is aimed at the elimination of the "residual equity

factor" from the reimbursement formula applied to for-profit nursing homes, which is a subject

of expertise reserved to the Department; and (3) the third applicable *Burford* "factor" (i.e.,

whether the subject matter of the litigation is traditionally one of state concern) weighs in favor

of abstention, because multiple federal courts have recognized that a state's historical interest in

maintaining and applying its own carefully calibrated systems for the administration of Medicaid

is traditionally one of state concern, *see, e.g., Bethphage Lutheran Service, Inc. v. Weicker*, 965

F.3d 1239, 1244 (2d Cir. 1992), and *Osteopathic Hospital Founders Association v. Splinter*, 955

F. Supp. 1351 (N.D. Okla. 1996).   (Dkt. No. 24, Attach. 7, at 14-15, 18-20.)[7]

Generally, in their reply memorandum of law, Plaintiffs argue that *Burford* abstention is

inappropriate here for the following five reasons: (1) *Burford* abstention is extraordinary and

---

6       *See Burford v. Sun Oil Co*., 319 U.S. 315 (1943) (calling for abstention in cases when [1] there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case, or [2] the exercise of federal review would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern").

7       The Court notes that page citations in this Decision and Order refer to the screen numbers on the Court's Case Management / Electronic Case Filing ("CM/ECF") System, not to the page numbers stated on the documents contained therein.

narrow; (2) the cases relied on by Defendants are distinguishable, because (in addition to predating the widespread adoption of the Internet) they involve specific reimbursement determinations or regulatory regimes largely not at issue here; (3) for example, *Bethphage* and *Splinter* recognized that *Burford* abstention does not apply to systemic challenges to federal compliance obligations (like the current challenge); (4) Plaintiffs do not have an adequate recourse via the administrative appeal process, because the New York State Medicaid rate appeal process is limited to mathematical errors, and does not allow systemic methodology challenges (such as Plaintiffs' opposition to the elimination of ongoing capital reimbursement); and (5) there is no complex state apparatus with which a determination in this action would interfere, because (a) Defendant's 2024 Notice Rates on November 1, 2024, did not require any change to the underlying regulation, 10 N.Y.C.R.R. § 86-2.21(e)(7), and (b) in any event, during the pendency of this motion, Defendant was able to swiftly restore reimbursement for ongoing capital expenses incurred by some or all of Plaintiffs (demonstrating that this is not a complex process).   (Dkt. No. 27, at 5, 11-16.)

After carefully considering the matter, the Court finds that *Burford* abstention is inappropriate here for the reasons stated by Plaintiffs.

### B.    Appropriate Standard: Ordinary or Heightened

Generally, in their opening memorandum of law, Plaintiffs argue that the appropriate standard governing their motion is the ordinary one requiring only a likelihood of success and a showing of irreparable harm (rather than the heightened one requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm), because the requested injunction is prohibitory in nature in that it seeks merely to *maintain* (not alter) the *status quo ante*, which is defined as "the last actual, peaceable uncontested status which preceded

11

the pending controversy." (Dkt. No. 18, Attach. 58, at 11-12.)

Generally, in his opposition memorandum of law, Defendant responds that the appropriate standard governing Plaintiffs' motion is the heightened one requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm (rather than the ordinary one requiring only a likelihood of success and a showing of irreparable harm), because the requested injunction is mandatory in nature in that it seeks *alter* the *status quo ante*.  (Dkt. No. 24, Attach. 7, at 21-22.)

Generally, in their reply memorandum of law, Plaintiffs argue that the requested injunction does not in fact seek to alter the *status quo ante*, because the *status quo ante* is the state of affairs existing before Defendant started to implement the systemic change in rate methodology of which he gave notice on November 1, 2024.  (Dkt. No. 27, at 5, 10, 13.)

After carefully considering the matter, the Court finds that the ordinary standard is appropriate for the reasons stated by Plaintiffs.  To those reasons, the Court adds that, even if "the last actual, peaceable uncontested status" was not before November 1, 2024 (when Defendant gave notice of the rate change) but before December 24, 2024 (when Plaintiffs filed their Complaint),[8] the status of things on December 24, 2024, was one in which Defendant had not yet begun to withhold reimbursement for ongoing and necessary capital costs (which was scheduled to begin in 2025).

In any event, in the interest of thoroughness, the Court will alternatively apply the heightened standard.

### C.    Irreparable Harm

---

[8]    *See N. Am. Soccer League, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 31, 37 (2d Cir. 2018) (looking at the state of affairs "[b]efore this litigation" in ascertaining the status quo for purposes of a motion for a preliminary injunction).

Generally, in their opening memorandum of law, Plaintiffs argue that they have demonstrated irreparable harm for the following three reasons: (1) reimbursement for ongoing capital costs is a necessary element of the Medicaid rate paid by New York State to Plaintiffs pursuant to N.Y. Public Health Law §§ 2807(3) and 2808 in accordance with its mandate under N.Y. Const. Art. XVII, § 1 to provide care to the State's most needy and vulnerable residents; (2) without that reimbursement, facilities cannot pay for the necessary costs resulting from their provision of high-quality care in their high-traffic, high-wear-and-tear facilities (including replacing worn surfaces and finishes such as flooring, upgrading or replacing crucial fixed equipment such as HCAC units, and maintaining and replacing external facility components such as roofs and walkways); and (3) this will cause the immediate deterioration of facilities, loss of decades of goodwill, loss of staff to younger competitors, loss of referrals from hospitals, and harm to vulnerable residents.  (Dkt. No. 18, Attach. 58, at 13-15.)   In support of this argument, Plaintiffs cite *Niskayuna Operating Co., LLC v. Sebelius*, 10-CV-1265, 2010 U.S. Dist. LEXIS 144292, at \*6-7 (N.D.N.Y. Oct. 26, 2010) (Sharpe, J.) (finding that a nursing home faces irreparable harm when it loses admissions of new residents, its staff seek other employment, and its residents and their caregivers make arrangements to leave the facility).   (*Id*. at 12, 14-15.)

Generally, in his opposition memorandum of law, Defendant responds that Plaintiffs have not demonstrated irreparable harm for the following three reasons: (1) to establish irreparable harm, the moving party must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages"; (2) here, the alleged injury is remote and speculative, because such things as the drying up of referrals from hospitals and loss of staff have not yet occurred and are not likely to occur given that Plaintiffs

are for-profit entities (that are presumably not solely reliant on Medicaid funding to care for their

clients and pay their staff); and (3) in any event, the alleged injury can be remedied by an award

of money damages.   (Dkt. No. 24, Attach. 7, at 22-23.)

Generally, in their reply memorandum of law, Plaintiffs argue that Defendant's response

is unpersuasive for the following three reasons: (1) contrary to Defendant's contention, Plaintiffs

do not have to wait for their roofs to fail or their staff to quit before seeking relief, because all

that is required is a substantial risk of harm, which Plaintiffs have clearly shown here; (2) in

particular, Defendants have not controverted Plaintiffs' evidence that their Medicaid rates are

already facially insufficient and that any reduction in necessary capital reimbursement causes

immediate harm to their viability as ongoing businesses, their ability to attract and maintain the

best staff, and to the overall resident experience; and (3) Defendants' reliance on the fact that

Plaintiffs are for-profit entities is misplaced because (a) residents do not lose their right to the

highest quality of care when they enter a for-profit nursing facility, and (b) the immediate result

of the decline of the ability to maintain, repair and replace facility equipment and components in

this highly competitive market will be the loss of goodwill, which has been recognized as

sufficient under *ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019)

(affirming grant of preliminary injunction based on harm to "good will and reputation").   (Dkt.

No. 27, at 16-18.)

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated

irreparable harm (and, in the alternative, Plaintiffs have demonstrated a *strong* showing of

irreparable harm) for the reasons they state.   To those reasons, the Court adds only two brief

points.

First, in the preliminary-injunction hearing, Defendant did not introduce admissible

14

evidence persuasively rebutting Plaintiffs' evidence that their Medicaid rates are already facially

insufficient and that any reduction in necessary capital reimbursement causes immediate harm to

their viability as ongoing businesses, their ability to attract and maintain the best staff, and to the

overall resident experience.   The closest Defendant came to doing so is when he adduced the

hearing testimony of Kevin Wright, who characterized Chelsea Murray's prior hearing testimony

(regarding the insufficiency of the nursing home rate statewide) as "a matter of opinion," one

that "I don't know that I agree with . . ."   (Hrg. Tr. at 142.)   However, a party cannot create

genuine dispute about a fact merely by challenging the credibility of the opposing witness,[9] by

arguing that that the fact has not been conclusively established,[10] or by expressing a lack of

knowledge about the fact.[11]

     Second, in any event, Plaintiffs have adduced admissible evidence of the loss of good

---

[9]    *See Desia v. GE Life & Annuity Assurance Co*., 350 F. App'x 542, 545 (2d Cir. 2009) ("This general attack on Stewart's competence, even if credited, provides no evidence . . . . Accordingly, we uphold the award of summary judgment in favor of defendants."); *Island Software and Computer Serv., Inc. v. Microsoft Corp*., 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact."); *McCullough v. Wyandanch Union Free Sch. Dist*., 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness'] honesty"); *Estate of D.B. v. Thousand Island Cent. Sch. Dist*., 327 F. Supp. 3d 477, 490 n.12 (N.D.N.Y. 2018) ("A non-movant may not create a genuine issue of material fact by simply challenging the credibility of a declarant.").

[10]    *Cf. Cantey vs. County of Albany*, 16-CV-0014, 2018 WL2727868, at *2 (N.D.N.Y. June 6, 2018) ("[I]n order to satisfy Defendants' modest threshold burden on their motion, Defendants need not cite evidence that conclusively establishes their factual assertion but need only cite evidence that is relevant, i.e., that makes the factual assertion more probable than it would be without the evidence.").

[11]    *Cf. Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact.").

will they would experience if their motion were denied.   (*See, e.g.*, Hrg. Tr. at 8-9, 18-19, 30, 69, 72-73, 111, 155.)[12]

Third, Defendant did not establish that the certain and imminent harm that would befall Plaintiffs if their motion were denied could be adequately compensated through a monetary award (or avoided altogether if Plaintiffs somehow came up with more money).   (*See generally* Hrg. Tr.)

For all of these reasons, the Court finds that Plaintiffs have demonstrated irreparable harm (or, in the alternative, a *strong* showing of irreparable harm).

### D.    Likelihood of Success on the Merits

#### 1.    Res Judicata / Collateral Estoppel

The Court begins its analysis of this issue by observing that, on October 20, 2025 (after briefing was complete on Plaintiffs' motion), Defendant filed a "status report," bringing to the Court's attention a recent decision by a New York State Court in proceedings that Defendant argues are "directly related to issues raised by Plaintiffs in this case."   (Dkt. No. 31, at 1.)   By arguing that some of the claims in the state proceeding arise under 42 U.S.C. § 1983 and the U.S. Constitution, Defendant appears to ask the Court to apply the claim-preclusion doctrine of res judicata (if not the issue-preclusion doctrine of collateral estoppel).   (*Id.*)

---

12      *See ExpertConnect, LLC v. Parmar,* 773 F. App'x 651, 653 (2d Cir. 2019) (affirming grant of preliminary injunction based on harm to "good will and reputation"); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages."); *see, e.g., Niskayuna Operating Co., LLC v. Sebelius*, 10-CV-1265, 2010 WL 4248852, at *2 (N.D.N.Y. Oct. 26, 2010) (Sharpe, J.) (finding nursing home faces irreparable harm because "(a) Plaintiff will stop receiving admissions, (b) staff will start seeking alternative employment and leaving, and (c) individuals responsible for the care and treatment of those housed at the Facility will make arrangements to have them removed").   The Court notes that, even if there were no loss of good will, at least some of Plaintiffs' residents would lose their homes.   (*See, e.g.,* Hrg. Tr. at 8-9.)

In response, Plaintiffs argue, among other things, that the above-referenced state court proceeding does not, in fact, involve the issue in this case (which is "the Department of Health's unexplained and unjustified decision to eliminate ongoing capital funding for Plaintiffs based upon their age").  (Dkt. No. 34.)

After carefully considering the matter, the Court finds that no preclusion doctrine applies here for the reasons stated by Plaintiffs.   To those reasons, the Court adds the following three points: (1) the "residual equity reimbursement" component contained within Medicaid rates is somewhat related to, but sufficiently distinct from, the "ongoing capital reimbursement" component contained within Medicaid rates (specifically, the former is part of, but not the entirety of, the latter);[13] (2) although the plaintiffs asserted an equal protection claim in the state action, that claim was based on a comparison of for-profit and not-for-profit nursing homes, while here Plaintiffs' equal protection claim is based on a comparison of for-profit nursing homes over 40 years old and those in operation for less than 40 years; and (3) although Defendant argues that the state-court action involves the "statute at issue in the instant federal proceeding – New York Public Health Law § 2808(20)(d))," in fact Plaintiffs in this federal

---

[13]    For example, in addition to the former, the latter includes factors such as depreciation, leases and rentals, and interest on capital debt.   *See* 10 N.Y.C.R.R. § 86-2.10(a)(9) ("Capital costs shall mean costs reported in the depreciation, leases and rentals, interest on capital debt and/or major movable equipment depreciation cost centers, as well as costs reported in any other cost center under the major natural classification of depreciation, leases and rentals on the facilities annual cost report (RHCF-4).").   (*See also* Hrg. Tr. at 84-85 [Hrg. Testimony of Chelsea Murray, stating that "the capital rate" is the rate that is defined as the depreciation, lease and rentals, interest on capital debt, as well as moveable depreciation that are as reported in those cost centers on the Medicaid cost report"]; Hrg. Tr. at 163-64 [Hrg. Testimony of Michael Spitzer, stating that "the capital reimbursement component of the rate setting process" includes "generally, like, amortization, interest, and then, like, the true, like, property real estate value"]; Dkt. No. 24, at 4 [Def.'s Opp'n Memo. of Law, arguing, "The capital component primarily reimburses for interest on capital indebtedness and the cost of the real property building and equipment"].)

proceeding do not challenge that statute (which regards the residual equity reimbursement), but rather Defendant's decision to eliminate ongoing capital investment for Plaintiffs based on their age. (Dkt. No. 32, at 1.)

### 2. Equal Protection Claim

Generally, in their opening memorandum of law, Plaintiffs argue that they have demonstrated a likelihood of success on the merits of their equal protection claim, because they have submitted clear and persuasive proof showing as follows: (1) that they are similarly situated to for-profit homes that have less than 35 years of operation (*see, e.g.,* Murray Decl. ¶¶ 15-28; Rosso Decl. ¶¶ 26-33; May Decl. ¶¶ 10-16); (2) that they are receiving unequal treatment with regard the reimbursement rules when compared to such similarly situated other facilities (which is causing Plaintiffs harm); and (3) that the unequal treatment lacks a rational basis (especially in light of the New York State requirement that Medicaid reimbursement rates must be sufficient to meet the reasonable and necessary costs required in the provision of economic and efficient long-term care) and is fueled by unfounded animus toward Plaintiffs' class of facilities (*see* Rosso Decl. ¶¶ 6-7). (Dkt. No. 18, Attach. 58, at 15-17.)

Generally, in his opposition memorandum of law, Defendant responds that Plaintiffs have not demonstrated a likelihood of success on the merits of their equal protection claim for the following reasons: (1) it is far from certain that for-profit nursing homes facilities operating for more than forty years are similarly-situated to facilities operating for forty years and less (especially given that, under Generally Accepted Accounting Principles, forty years is designated as the "useful life" of a facility for depreciation purposes); and (2) in any event, a rational basis exist for any such unequal treatment, specifically (a) the achievement of cost-saving during a full-blown fiscal emergency and/or (b) the elimination of fraud, waste and abuse by nursing

18

home operators who would inflate capital costs in the benchmark or "measuring" year in order to enjoy larger residual-equity reimbursements after forty years (*see* Wright Decl. ¶¶ 10-11). (Dkt. No. 24, Attach. 7, at 24-29.)

Generally, in their reply memorandum of law, Plaintiffs argue that Defendant's response is unpersuasive for the following reasons: (1) Plaintiffs showed in their moving papers and show again here on reply that, when it comes to reimbursement of ongoing capital costs, for-profit facilities with fewer than 40 years of operation are 100% comparable with facilities with more than 40 years of operation (*see* Greene Reply Decl. Ex. A ), and that fact is not changed by Defendant's reliance on a non-expert interpretation of Generally Accepted Accounting Principles, which apply to depreciation (i.e., how an asset is categorized for taxation and expense realization purposes) and not reimbursement or operation of a facility, and which depend on the age of a facility's physical buildings and not the number of years the facility has been in operation; and (2) cost-saving is not a sufficient justification to warrant unequal treatment (because, if it were, then no economic decision made by a state actor could ever be reviewed for equal protection purposes), and the need to eliminate fraud, waste and abuse is unsupported by any record evidence (and, indeed, is fictional in nature). (Dkt. No. 27, at 20-23.)

After carefully considering the matter, the Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of their equal protection claim for the reasons stated by Defendant. To those reasons, the Court adds that, at the preliminary injunction hearing, Plaintiffs did not persuade the Court that they have a more than 50 percent chance of winning their argument that cost-savings during a fiscal emergency is *not* a rational basis. Indeed, during oral argument, Plaintiffs' counsel admitted that cost-savings during a fiscal emergency is, at least, a "partial rational basis" for the unequal treatment that Plaintiffs claim.

(Hrg. Tr. at 197 [Hrg. Transcript of closing argument by Plaintiffs' counsel, acknowledging that "cost savings during a fiscal emergency" is at least "a partial rational basis" for the unequal treatment Plaintiffs claim].)   Based on the current briefing, the Court is simply not persuaded by Plaintiffs' argument that this basis has been rendered irrational by the fact that the costs savings were of a mandatory (and not discretionary) program.   (*Id.*)

### 3.    Due Process Claim

Generally, in their opening memorandum of law, Plaintiffs argue that they have demonstrated a likelihood of success on the merits of their due process claim, because they have submitted clear and persuasive proof showing that Defendant failed to satisfy his obligations under 42 U.S.C. § 1396a(a)(13)(A), including proof of the following: (1) that no methodology or justification accompanied the 100% cut in ongoing capital reimbursement shown in the November 2024 "Notice Rates" provided to Plaintiffs; and (2) that disclosure of the methodology and justification behind such a reduction is essential to allowing Plaintiffs and other relevant stakeholders the ability to seek legislative or administrative redress.   (Dkt. No. 18, Attach. 58, at 15-17.)   In support of this argument, Plaintiffs cite *Bourbonnais Care v. Norwood*, 866 F.3d 815, 824 (7th Cir. 2017) (holding nursing home operators can bring claim under 42 U.S.C. § 1396a(a)(13)(A) for state's failure to provide public process for setting payment rates) and *Pinnacle Nursing Home v. Axelrod*, 719 F. Supp 1173, 1182 (W.D.N.Y. 1989) (granting injunction because of state's failure to follow procedural requirements of 42 U.S.C. § 1396a(a)(13)(A)), *aff'd in relevant part*, 928 F.2d 1306 (2d Cir. 1991).   (Dkt. No. 18, Attach. 58, at 16-17.)

Generally, in his opposition memorandum of law, Defendant responds that Plaintiffs have not demonstrated a likelihood of success on the merits of their due process claim for the

20

following reasons: (1) Plaintiffs do not have a protected property right in reimbursement sufficient to trigger entitlement to procedural due process, because nothing about the Medicaid program or the statutes and rules referenced in the Complaint created an entitlement to continued reimbursement, and in fact even participation in the Medicaid program itself is not and was never meant to be a protected property right; and (2) in any event, Plaintiffs were afforded procedural due process at all stages of the underlying fact pattern by receiving (a) notice in advance of the rate change, (b) multiple opportunities to submit input before and after the rate change, and (c) a right to administratively appeal rates believed to be inaccurate.   (Dkt. No. 24, Attach. 7, at 29-38.)

Generally, in their reply memorandum of law, Plaintiffs argue that Defendant's response is unpersuasive for the following reasons: (1) rather than seek to dictate a certain rate, or to guarantee their continued participation in the Medicaid program, Plaintiffs' due process claim is based on 42 U.S.C. § 1396a(a)(13)(A)(ii)'s creation of a clear public process right to "a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications" behind rate-setting decisions made part of the State's Medicaid plan; (2) in this sense, Plaintiffs are not claiming a protected property right for purposes of the Due Process Clause of the Fifth and Fourteenth Amendments, but a violation of 42 U.S.C. § 1396a(a)(13)(A) for purposes of 42 U.S.C. § 1983; and (3) on the current record, it is undisputed that (setting aside the issues of opportunity to comment and opportunity to appeal) Defendant did not disclose either the methodology or justification behind the 100% capital rate reduction indicated in the November 1, 2024 Notice Rates.   (Dkt. No. 27, at 18-19.)   In support of their argument, Plaintiffs cite *Bourbonnais Care v. Norwood*, 866 F.3d 815, 822 (7th Cir. 2017) (finding that nursing home operators "have an enforceable procedural right to the public process outlined in

section 1396a(a)(13)(A)") and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990) (holding that § 1983 applies to 1396a(a)(13)(A)).   (Dkt. No. 27, at 18.)

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of their due process claim (and, in the alternative, Plaintiffs have demonstrated a *clear or substantial* likelihood of success on the merits of their due process claim) for the reasons they state.   To those reasons, the Court adds the following four points: (1) at the preliminary injunction hearing, Defendant did not persuade the Court that the State did in fact somehow provide Plaintiffs with advanced notice of methodology and justification for the rate change at issue in this action, or that a challenge to the methodology and justification for the rate change could be brought in an appeal pursuant to N.Y.C.R.R. § 86-2.13;[14] (2) prior notice of a rate change appears distinct from prior notice of the methodology and justification for a rate change; (3) an opportunity to comment on a rate change appears to be of little use without prior notice of the methodology and justification for the rate change; and (4) an opportunity to appeal a rate based on mathematical errors (*see* 10 N.Y.C.R.R. § 86-2.13 [expressly limiting appeals process to "errors resulting from submission of fiscal and statistical information by a residential

---

[14]     More specifically, the Court respectfully disagrees with defense counsel that the "methodologies" and "justifications" that are required to be "published" under 42 U.S.C. § 1396a(a)(13)(A) were somehow embodied in the one-and-one-half page (359-word) "Dear Administrator" letter that was provided to Plaintiffs on or about November 1, 2024 (as well as the entire process of a 60-day comment period and opportunity to appeal).   (*Compare* Hrg. Tr. at 208-09 [Hrg. Tr. containing defense counsel's argument] *with* Dkt. No. 24, Attach. 5 [attaching the "Dear Administrator" letter as Ex. 5 to Wright Decl.].)   They were not.   The closest the "Dear Administrator" letter came to publishing the "justification" for the rate change at issue in this action is the indication that the rate change was "implemented with the State Fiscal Year 2021-22 and 2024-25 Enacted *Budgets*."   (Dkt. No. 24, Attach. 5, at 1.)   Such a justification hardly enables Plaintiffs a reasonable opportunity for review and comment.   Finally, the Court can find no language indicating that Defendant published the "methodology" underlying the rate change.   (*Id*. at 1-2.)

health care facility"]) is distinct from the opportunity to appeal a rate based on an irrational or discriminatory change in its systemic methodology.[15]

### E.    Balance of Equities and Public Interest

Generally, in their opening memorandum of law, Plaintiffs argue that a balance of the equities favors an injunction for the following reasons: (1) generally, any harm to the public is minimal where (as here) an injunction would do nothing more than maintain the status quo during the pendency of an action; (2) if any injunction were issued but Defendant were to ultimately prevail in this action, Defendant would not be harmed, because (a) he would still have the ability to claw back any funds deemed an overpayment of any Plaintiff via the Office of Medicaid Inspector General ("OMIG") audit process, and (b) as participants in the State Medicaid Program, all Plaintiffs would possess an ongoing income stream against which Defendant could recoup overpayments; and (3) meanwhile, were an injunction not issued, Plaintiffs and their residents would suffer the immediate and irreparable harms described earlier. (Dkt. No. 18, Attach. 58, at 17-18.)

In addition, Plaintiffs argue that the public interest favors an injunction for the following reasons: (1) if an injunction were to not issued, there would be immediate and irreparable harm to the constitutionally mandated crucial care delivery system that Plaintiffs represent, particularly to residents in communities without options other than Plaintiffs; (2) indeed, there is no community interest in seeing a nursing home that has been a trusted provider of care in the

---

[15]    (*See* Hrg. Tr. at 115 [Hrg. Testimony of Chelsea Murray, stating that, in the Medicaid appeal process, "[w]e are unable to dispute what I'll call methodology"]; cf. Hrg. Tr. at 166 [Hrg. Testimony of Michael Spitz, stating that "[t]hey could submit an appeal [regarding the elimination of residual equity reimbursement after 2020 for for-profit nursing homes] . . . but because that was an appeal based off of a methodology per state statute, it would respectfully be denied"].)

community for decades begin to fade, reduce its grounds care and external upkeep, or delay its replacement of worn or obsolete furnishings and equipment; (3) any public interest in ending and/or recouping alleged overpayments to Plaintiffs is diminished by the fact that (a) no such overpayments have yet been proven, and (b) any such overpayments may be recouped via the OMIG audit process; and (4) the expressed intent of the Legislature's actions in its 2020 amendments to N.Y. Public Health Law § 2808(20)(d) was to end any potential for disproportionate reimbursement (known as residual equity), not slash ongoing capital reimbursement to providers by 100%.   (*Id*. at 18-20.)

Generally, in his opposition memorandum of law, Defendant responds as follows: (1) in a suit against the government (as here), a balancing of the equities merges into a consideration of the public interest, effectively forming a single factor; (2) generally, the public-interest considerations associated with the performance of government functions are assigned particularly high value in balancing parties' claims of injury; and (3) here, the conservation of public resources, the efficient administration of government programs and public confidence therein, and the avoidance of waste and fraud in government outweighs Plaintiffs' speculative pecuniary harms in this matter.   (Dkt. No. 24, Attach. 7, at 38-40.)

Generally, in their reply memorandum of law, Plaintiffs argue as follows: (1) Defendant's response ignores the fact that the care provided by Plaintiffs to their residents is constitutionally mandated and itself the most important public interest of the State, i.e., caring for the state's most vulnerable residents; (2) Defendant's recent "about-face" regarding capital reimbursement reveals his "public interest" argument to be a mirage; and (3) nothing could be more squarely in the public interest than requiring Defendant to comply with the public process mandated in 42 U.S.C. § 1396a before making a rate change, and to eschew rate changes that are discriminatory

24

in nature.   (Dkt. No. 27, at 23-24.)

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated that both a balance of the equities and the public interest favor an injunction for the reasons they state.

### F.    Giving of Security

Generally, in their opening memorandum of law, Plaintiffs argue that they should not be required to give security should the Court grant the preliminary injunction, because Defendant would face no harm in the event that he was wrongfully enjoined.   (Dkt. No. 18, Attach. 58, at 20, n.6.)   In support of this argument, Plaintiffs rely on *Hunter v. Cortland Hous. Auth.*, 714 F. Supp. 3d 46 (N.D.N.Y. 2024) (excusing plaintiffs from giving security due to lack of proof of "costs and damages" that defendant housing authority would experience if preliminary injunction was incorrectly granted).   (Dkt. No. 18, Attach. 58, at 20, n.6.)

Neither Defendant in his response nor Plaintiffs in their reply address the issue of a bond. (*See generally* Dkt. No. 24, Attach. 7; Dkt. No. 27.)   Nor did Defendant address the issue during the preliminary injunction hearing.   (*See generally* Hrg. Tr.)

After carefully considering the matter, the Court finds that Plaintiffs have demonstrated that they should not be required to give security for the reasons they state.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for an Order preliminarily enjoining Defendants, pursuant to Fed. R. Civ. P. 65 (Dkt. No. 18) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant is enjoined from taking any action to eliminate the ongoing capital reimbursement of Plaintiffs on line 60 of their Medicaid rate sheets, including as indicated in the so-called "Notice Rates" issued to Plaintiffs on or about November 1, 2024, or

via recoupment of amounts paid under line 60 between April 2020 and December 2024, during the pendency of this action;[16] and it is further

**ORDERED** that, in order to afford Defendant an opportunity to consider his appellate options (including whether to apply to the Second Circuit for a stay of this Preliminary Injunction pending appeal), the Court *sua sponte* temporarily stays this Preliminary Injunction for a period of **FOURTEEN (14) DAYS** from the date of entry of this Decision and Order.

Dated: December 30, 2025
       Syracuse, New York

Glenn T. Suddaby
U.S. District Judge

---

[16]     This preliminary injunction does not require the reinstatement of the "residual equity" reimbursement that was at issue in the Decision and Order/Judgment of October 9, 2025, entered by New York State Supreme Court, Albany County, in the following combined hybrid Special Proceedings / Declaratory Judgment matters: *Aaron Manor Rehabilitation and Nursing Center LLC v. Zucker*, Index No. 906847-21; *Bethany Operating Co., LLC v. Bassett et al.*, Index No. 905379-22; and *Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC v. Bassett*, Index No. 907653-20.   (Dkt. No. 31, Attach. 1.) As Plaintiffs' counsel repeatedly explained during closing argument at the preliminary injunction hearing, "[W]e are not seeking the reinstitution of residual equity, period. That is not at issue in this suit. . . .   [W]e are not seeking reinstatement of residual reimbursement. . . . We are not seeking restitution of residual equity." (Hrg. Tr. at 195, 198, 200.)